UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

**ROSA ALBA FLORES-HERNANDEZ**,

Plaintiff,

v.

**UNITED STATES OF AMERICA**, *et al.*,

Defendants.

Civil Action No. 11-cv-897 (RLW)

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

Upon consideration of the parties' undisputed and stipulated facts, as well as the testimony of the witnesses, the exhibits,[1] and the arguments of the parties presented at trial, the Court makes the following findings of fact and conclusions of law in this matter.

## BACKGROUND

Plaintiff Rosa Alba Flores-Hernandez ("Plaintiff" or "Flores-Hernandez") brings this medical malpractice action against Defendant United States of America ("Defendant" or the "Government") pursuant to the Federal Tort Claims Act, 285 U.S.C. §§ 1346(b) & 2671, *et seq.* Specifically, Flores-Hernandez asserts that Dr. Luis Padilla—an employee of Unity Health Care, Inc., in whose stead the United States now stands under the Federally Supported Health Centers Assistance Act, 42 U.S.C. § 233(g)–(n)—negligently delayed in referring her for diagnostic gynecological testing for cervical cancer. Flores-Hernandez contends that, had Dr. Padilla

---

[1]     The Court received the following exhibits into evidence during the course of trial: Plaintiff's Exhibits: 1, 36, 37, 38, 39, 40, 43, 44, 82, 93, 95, 100, 106-B, 142, 143, 153, 154, 155, 156, 157, 158, 159, 160, 161, 162, 163, 164, and 165; Defendant's Exhibits: 14, 17, 18, 21, 24, 25, 26, 27 (redacted), 29, 30, 31, 32, 33, 34, 35, 36, 37, 38, 40, 41, 42, 43, 44, 46, 48, 49, 50, 51, 54, 56, 58, 59, 61, and 73.

referred her for such testing earlier, specialists would have diagnosed and completely treated her condition as a pre-malignancy or an early stage cancer, rather than Stage IVA cervical cancer, as her doctors ultimately diagnosed in July 2010.

## FINDINGS OF FACT

The Court finds that the following facts have been established by a preponderance of the evidence:

**Flores-Hernandez's Patient Care History**

1.  Flores-Hernandez first went to Unity Health Care's Upper Cardozo Clinic, located in the Columbia Heights neighborhood of the District of Columbia, in 2004.

2.  At that time, Flores-Hernandez's primary care physician became Dr. Luis Padilla.  As her primary care physician, Dr. Padilla provided Flores-Hernandez with basic gynecological care, including Pap smears, pelvic exams, and "well-woman" physicals.

3.  In August 2006, Dr. Padilla performed an annual "well-woman" exam on Flores-Hernandez, which included a Pap smear.  The results of the Pap smear were negative for intraepithelial lesions and malignancy.   In addition, because no abnormalities were detected in the Pap smear, reflex testing for the human papillomavirus ("HPV") was not triggered and no HPV testing was performed at that time.

4.  On November 7, 2007, Flores-Hernandez went to see Dr. Padilla complaining of heavy, irregular menstrual bleeding for the past six months.   Dr. Padilla classified these symptoms as menometrorrhagia, and he began a differential diagnosis to determine the cause of the bleeding.  Dr. Padilla placed a number of potential causes on his differential

diagnosis at that time, including early-onset menopause, uterine fibroids, and cervical cancer.

5.    During that visit, Dr. Padilla performed a Pap smear on Flores-Hernandez to screen for cervical cancer or any other abnormalities.  He also ordered complete blood work and a urine pregnancy test, and he prescribed Flores-Hernandez a nonsteroidal anti-inflammatory, Naproxen.

6.    Dr. Padilla did not refer Flores-Hernandez to a gynecologist for any further follow-up examination or testing at that time.

7.    A Pap smear is a screening test that shows whether a woman has atypical cervical cells and/or HPV.  A Pap smear is performed by scraping or brushing loose cells from the outer opening of the cervix.  Those cellular specimens are then reviewed by a pathologist.

8.    The results of Flores-Hernandez's November 2007 Pap smear were returned as unsatisfactory for evaluation due to obscuring blood, although they did reveal the presence of trichomoniasis, a sexually-transmitted disease.

9.    Following her November 2007 Pap smear, Flores-Hernandez was scheduled for a follow-up appointment in late November, but she failed to attend the appointment.

10.   Flores-Hernandez visited Upper Cardozo Clinic on December 6, 2007, along with her boyfriend, Freddy Alvarado.  Although Unity's progress notes do not contain any specific details about the visit, Flores-Hernandez testified that she and Mr. Alvarado saw Dr. Padilla, who informed them of the trichomoniasis findings from her Pap smear and provided them with a 3-page handout describing trichomoniasis, and the Court credits that testimony.  Dr. Padilla did not recall whether he saw Flores-Hernandez and/or Mr. Alvarado on December 6th, let alone any details about their visit.

11. Flores-Hernandez also testified—both on cross-examination and on redirect—that Dr. Padilla performed a Pap smear during that December 6th visit.  However, there were no records or results of such a test otherwise introduced during trial, and the Court does not credit this testimony.

12. The next time that Flores-Hernandez went to the clinic was as a walk-in patient on December 16, 2008, complaining of pain in her left lower leg.  She was unable to be seen on this date because the Upper Cardozo Clinic was only open for a half-day with only one healthcare provider on site.

13. Flores-Hernandez returned to the Upper Cardozo Clinic two days later, on December 18, 2008, for a "well-woman" exam with Dr. Padilla.  Dr. Padilla performed a Pap smear on Flores-Hernandez during that visit, and he also ordered a pelvic ultrasound.

14. During Flores-Hernandez's December 2008 visit with Dr. Padilla, she did not complain about any unusual or irregular symptoms of menstrual bleeding.

15. Unity received Flores-Hernandez's Pap smear results on January 6, 2009, and Dr. Padilla reviewed those results on January 15, 2009.  The results reported that Flores-Hernandez had atypical squamous cells of undetermined significance ("ASCUS") and confirmed that she had tested positive for high-risk HPV.

16. An ASCUS finding indicates that there are abnormal cells present, but ASCUS is considered the most common cervical cytology abnormality.

17. After reviewing the December 2008 Pap smear results, Unity referred Flores-Hernandez for a colposcopy and scheduled her for an appointment on March 20, 2009, with Amy Yoxthimer, a Physician's Assistant in Unity's Gynecological Services.

18.   Unity notified Flores-Hernandez of this appointment by sending a certified letter on February 18, 2009, to the address she had on file with the clinic.

19.   The letter was returned as "unclaimed" on or around March 4, 2009, and Flores-Hernandez did not appear for her appointment with Ms. Yoxthimer on March 20, 2009.

20.   Two months later, on May 14, 2009, Flores-Hernandez returned to the Upper Cardozo Clinic to see Dr. Padilla for "cold-like" symptoms and to follow up on test results.

21.   On May 14, 2009, when Dr. Padilla discovered that the Flores-Hernandez had failed to show up for the colposcopy that had been scheduled for March 20, 2009, he re-referred her for a colposcopy, instructed her to make the appointment that day, and reminded Flores-Hernandez of the importance of keeping her address information current.   Dr. Padilla also performed another Pap smear test during that visit.

22.   In conducting that Pap smear on May 14, 2009, Dr. Padilla noted visible changes on Flores-Hernandez's cervix.   He described those changes as "circumferential for adherent plaque, white color, os: friable."

23.   During Flores-Hernandez's May 2009 visit with Dr. Padilla, she did not complain about any unusual or irregular symptoms of menstrual bleeding.

24.   The lab results for Flores-Hernandez's May 2009 Pap smear again indicated ASCUS, but the results were negative for high-risk HPV.

25.   On June 8, 2009, Flores-Hernandez attended an appointment with Dr. Felicia Hamilton, a gynecologist at Unity's Upper Cardozo Clinic.   During the visit, Dr. Hamilton took Flores-Hernandez's patient history, including her gynecological history, but Flores-Hernandez did not disclose that she had any symptoms or history of irregular menstrual bleeding, and such did not complain of such during this visit.

26.    Dr. Hamilton also performed a colposcopy on Flores-Hernandez on June 8, 2009.

27.    During a colposcopy, a gynecologist uses a microscope to closely examine the patient's cells in the squamocolumnar junction of the cervix.  Using different magnetic lenses, the gynecologist also examines the patient's entire cervix and the upper third of the vagina area.  If any area(s) of concern are observed during the procedure (*i.e.*, dysplasia or some other type of abnormal lesion), the gynecologist will generally take a small biopsy of the area.  Finally, during the colposcopy, the gynecologist may attempt to obtain some tissue samples from the endocervical canal, by lightly scraping cells using a procedure called an endocervical curettage ("ECC").

28.    During Flores-Hernandez's colposcopy procedure on June 8, 2009, Dr. Hamilton took a biopsy from a condyloma—or genital wart—that she observed at the 6 o'clock position of the cervix.  Dr. Hamilton also performed an ECC during the procedure.

29.    Based on her observations during the colposcopy procedure, Dr. Hamilton believed that Flores-Hernandez had cervical intraepithelial neoplasia grade CIN-1.  CIN-1 is also referred to as low-grade dysplasia, a non-malignant condition.

30.    Unity received the lab results of Flores-Hernandez's colposcopy procedure a couple of days later, which confirmed Dr. Hamilton's initial impressions of CIN-1.  The results also noted that CIN-1 "account[ed] for the finding of ASCUS on the recent pap smear."

31.    CIN-1 is the lowest grade of abnormality that a patient can have next to normal.

32.    CIN-1 reflects the cytological and pathological effects of HPV infection.  Most CIN-1 lesions will never progress to cancer, and approximately 70 percent of CIN-1 lesions will resolve without any treatment.

33.  The generally accepted standard of care following a diagnosis of CIN-1 is to perform more frequent Pap smears every six months, and to monitor and observe the patient to determine whether the condition resolves.

34.  Following the procedure, Flores-Hernandez was scheduled for an appointment to review the colposcopy results on June 30, 2009.  Flores-Hernandez failed to appear for that appointment, however, and Unity sent a "no-show" letter to her address.

35.  About one month later, on July 27, 2009, Flores-Hernandez came to Unity's gynecological services complaining of irregular bleeding and hot flashes.  Flores-Hernandez reported to Ms. Yoxthimer, Dr. Hamilton's physician assistant, that she had been experiencing these symptoms for the past eight to nine months.

36.  Based on Flores-Hernandez's complaints of irregular bleeding, Ms. Yoxthimer ordered comprehensive blood work.  Suspecting that the symptoms might be caused by perimenopause (*i.e.*, early-onset menopause), Ms. Yoxthimer also prescribed Flores-Hernandez with Premarin, an estrogen supplement known to alleviate symptoms of excess bleeding caused by perimenopause.

37.  The lab results from Flores-Hernandez's blood work did not indicate anything unusual and were consistent with Ms. Yoxthimer's working diagnosis of perimenopause.

38.  Flores-Hernandez returned to Unity on August 10, 2009, and during that visit, she informed Ms. Yoxthimer that her irregular bleeding symptoms resolved after taking Premarin for several days.  Ms. Yoxthimer also attempted to perform an endometrial biopsy, in an effort to rule out endometrial cancer as a cause of Flores-Hernandez's recent complaints of irregular bleeding.  In attempting to perform the procedure, Flores-

Hernandez's cervix was stenotic, causing Ms. Yoxthimer difficulty in trying to insert the instruments past the cervix and into the endometrial cavity to obtain a tissue biopsy.

39.   Stenosis of the cervix can be caused by a variety of factors, including a former dilation and curettage performed in connection with a terminated pregnancy.

40.   Based on Flores-Hernandez's subsequent medical records from Howard University Hospital, she had previously undergone an incomplete abortion requiring dilation and curettage in 1990.

41.   The results of Flores-Hernandez's August 10, 2009 endometrial biopsy indicated that no endometrial tissue was obtained during the biopsy.  However, the results also reported that strips of squamous epithelium from the sample indicated CIN-1 to CIN-2, or mild to moderate dysplasia.

42.   Flores-Hernandez returned to Unity for a follow-up appointment with Ms. Yoxthimer on August 24, 2009.  Ms. Yoxthimer prescribed Flores-Hernandez a medication designed to soften her cervix, and discussed her plan to attempt another endometrial biopsy in December 2009, along with a Pap smear and an ECC.  Ms. Yoxthimer also referred Flores-Hernandez for a transvaginal sonogram.  During the visit, Flores-Hernandez again related that her irregular bleeding symptoms had resolved after her course of Premarin.

43.   At that time, Ms. Yoxthimer, in consultation with Dr. Hamilton, decided against referring Flores-Hernandez for a cone biopsy or a Loop Electrosurgical Excision Procedure ("LEEP"), despite the finding of mild to moderate dysplasia (CIN-1 or CIN-2) through recent testing.

44.   During a LEEP procedure, a sizeable piece of the cervix is biopsied and excised using a wire electrical loop while the patient is under local anesthesia.  A cone biopsy is a

surgical procedure that takes tissue from the exocervix and the endocervix in a "cone" or "wedge" shape. The tissue sample excised during a cone biopsy is generally much larger than that obtained through a cervical biopsy and/or an ECC.

45. Flores-Hernandez returned to Unity on September 4, 2009, to review the results of her sonogram. At that time, Flores-Hernandez indicated that her bleeding symptoms were controlled and that her pelvic pain had resolved. Ms. Yoxthimer reconfirmed that Flores-Hernandez should return in several months to repeat the endometrial biopsy, and for another colposcopy and Pap smear.

46. Flores-Hernandez returned to Unity on January 4, 2010, for an appointment with Dr. Hamilton. During the visit, Dr. Hamilton conducted a full examination and noted no unusual symptoms other than the genital wart previously identified on the cervix. Dr. Hamilton also performed a colposcopy with an ECC, along with a Pap smear.

47. In addition, Dr. Hamilton made three attempts to perform an endometrial biopsy on January 4, 2010, but she was unable to successfully perform the procedure because Plaintiff's cervix was still stenotic. Ultimately, Dr. Hamilton recommended that Flores-Hernandez go to a hospital for a dilation and curettage hysteroscopy, a procedure performed under general anesthesia during which a small camera enters the endometrial cavity and tissue is obtained.

48. Flores-Hernandez next saw Dr. Hamilton on February 1, 2010. During that visit, Dr. Hamilton reviewed Flores-Hernandez's test results with her. The Pap smear indicated ASCUS and was positive for high-risk HPV, and the ECC was normal and did not indicate cancer or dysplasia. Dr. Hamilton also asked Flores-Hernandez about pelvic pain, vaginal discharge, and bleeding; Flores-Hernandez reported no pelvic pain or

vaginal discharge, and she described "spotting," rather than heavy bleeding.  At that time, Dr. Hamilton provided Flores-Hernandez with a referral to George Washington Hospital for the dilation and curettage hysteroscopy they had previously discussed.

49.  Flores-Hernandez returned to Dr. Hamilton one month later, on March 1, 2010.  At that visit, Flores-Hernandez communicated that she had not yet gone to George Washington Hospital, apparently because she believed that it did not accept her insurance.  Although Dr. Hamilton was confident that this belief was inaccurate, she provided Flores-Hernandez with a new referral for the procedure to Howard University Hospital.

50.  At no point during her treatment from June 2009 through March 2010 did Dr. Hamilton diagnose Flores-Hernandez with cervical cancer.

51.  The actions of Ms. Yoxthimer were ratified by Dr. Hamilton, and Dr. Hamilton bears responsibility for those actions.

52.  Flores-Hernandez initially visited Howard University Hospital on March 15, 2010, at which time she was evaluated by gynecological specialists.  Although she was initially scheduled for a cone biopsy on April 6, 2010, Howard doctors canceled that procedure and created a plan to repeat the colposcopy in six months.  If the results of that colposcopy came back negative, then the doctors planned to repeat a Pap smear on Flores-Hernandez in one year; if the colposcopy showed moderate to severe dysplasia, then the doctors planned to proceed to a cone biopsy.

53.  A few months later, after intervention by Dr. Padilla, Flores-Hernandez underwent a cone biopsy at Howard University Hospital on June 30, 2010.  Doctors also performed a transurethral resection of Flores-Hernandez bladder tumor on July 22, 2010.  Following those procedures, Flores-Hernandez was diagnosed with Stage IVA cervical cancer.

54. Flores-Hernandez's cervical cone biopsy on June 30, 2010, showed well-differentiated invasive keratinizing squamous cell carcinoma of the uterine cervix.

55. The pathology from the June 30, 2010 cone biopsy contained no endocervical glands, and no endocervical margin could be identified.  Flores-Hernandez's tumor more likely than not extended beyond the margin taken by the cone biopsy.

56. Flores-Hernandez's bladder wall biopsy on July 22, 2010, showed metastatic squamous cell carcinoma that had spread from her cervical cancer.

57. The pathology reports for the Pap smear, and endometrial, cervical, and cone biopsies from December 22, 2008, May 15, 2009, June 10, 2009, August 11, 2009, May 18, 2010, June 30, 2010, and July 22, 2010, reflect accurate pathologic findings of the tissue sampled.

58. Cervical cancers are typically slow-growing cancers.

59. Flores-Hernandez underwent substantial treatment for her cervical cancer, including chemotherapy, invasive internal brachytherapy radiation treatments and external beam radiation.

60. Flores-Hernandez's most recent PET scan, a test used to detect cancer, was conducted in July 2012 and did not show evidence of a recurrence of cervical cancer.


## CONCLUSIONS OF LAW

### A.  Legal Standard for Medical Malpractice Claims

Plaintiff's claim against the Government is grounded in the Federal Tort Claims Act (FTCA), 28 U.S.C. §§ 1346(b) & 2671, *et seq.*  As explained by the Supreme Court, "[i]n the FTCA, Congress waived the United States' sovereign immunity for . . . 'claims against the

United States, for money damages . . . for injury or loss or property . . . caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment.'" *Ali v. Fed. Bureau of Prisons*, 552 U.S. 214, 217-18 (2008) (quoting 28 U.S.C. § 1346(b)(1)) (alterations in original).   The FTCA "authorizes private tort actions against the United States 'under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.'"   *United States v. Olson*, 546 U.S. 43, 44 (2005) (quoting 28 U.S.C. § 1346(b)(1)). Stated differently, the FTCA "does not create a cause of action against the United States; it allows the United States to be liable if a private party would be liable under similar circumstances in the relevant jurisdiction."   *Hornbeck Offshore Transp., LLC v. United States*, 569 F.3d 506, 509 (D.C. Cir. 2009).   Consequently, the Court must look to District of Columbia law in resolving Plaintiff's claims under the FTCA.

Under District of Columbia law, "[i]n a negligence action predicated on medical malpractice, the plaintiff must carry a tripartite burden, and establish: (1) the applicable standard of care; (2) a deviation from that standard by the defendant; and (3) a causal relationship between that deviation and the plaintiff's injury."   *Washington v. Wash. Hosp. Ctr.*, 579 A.2d 177, 181 (D.C. Cir. 1990) (citing *Ornoff v. Kuhn & Kogan, Chartered*, 549 A.2d 728, 731 (D.C. 1998); *Psychiatric Inst. of Wash. v. Allen*, 509 A.2d 619, 623-24 (D.C. 1986)).   "Each of these elements must usually be proved by expert testimony."   *Woldeamanuel v. Georgetown Univ. Hosp.*, 703 A.2d 1243, 1245 (D.C. 1997); *see also Cleary v. Group Health Ass'n*, 691 A.2d 148, 153 (D.C. 1997).

**B.  Whether Dr. Padilla Violated The Applicable Standard of Care**

"In the District of Columbia, the applicable standard of care in a medical malpractice action is 'a national standard, not just a local custom.'" *Nwaneri v. Sandidge*, 931 A.2d 466, 470 (D.C. 2007) (quoting *Travers v. District of Columbia*, 672 A.2d 566, 568 (D.C. 1996)).  To establish the national standard of care, a plaintiff must prove "the course of action that a reasonably prudent doctor with the defendant's specialty would have taken under the same or similar circumstances." *Id.* (quoting *Strickland v. Pinder*, 899 A.2d 770, 773 (D.C. 2006)).  In turn, "[t]he personal opinion of the testifying expert as to what he or she would do in a particular case . . . is insufficient to prove the applicable standard of care." *Strickland*, 899 A.2d 773. Rather, "[t]he testifying expert must establish that a particular course of treatment is followed nationally either through reference to a published standard, [discussion] of the described course of treatment with practitioners outside the District . . . at seminars or conventions, or through presentation of relevant data." *Id.* (quoting *Travers*, 672 A.2d at 568-69) (internal quotations omitted) (alteration in original).

In this case, Flores-Hernandez contends that Dr. Padilla was required to refer her to a gynecologist for diagnostic testing for cancer—*i.e.*, a colposcopy and/or other biopsies—as soon as she presented to him with symptoms of irregular and excessive menstrual bleeding, classified as menometrorrhagia, in November 2007.  Flores-Hernandez argues that, by failing to refer her to a specialist at that time and instead performing only a Pap smear—which the parties agree is a screening test and not a diagnostic test—Dr. Padilla breached the national standard of care.  The Government paints a different picture.  It argues that Flores-Hernandez's presentation to Dr. Padilla with menstrual bleeding in November 2007, without more, did not require a referral to a gynecologist.  Instead, the Government contends that, notwithstanding Flores-Hernandez's

symptoms of menstrual bleeding, the national standard of care did not require Dr. Padilla to refer her to a specialist unless and until a Pap smear revealed irregular results.  Because Dr. Padilla made such a referral after receiving Flores-Hernandez's first irregular results—when the Pap smear administered in December 2008 indicated ASCUS and high-risk HPV—the Government argues that Dr. Padilla fully complied with the national standard of care.

To support her theory, Flores-Hernandez relies on the expert testimony of Dr. Richard Boothby, a board-certified gynecologist and gynecologic oncologist.  According to Dr. Boothby, when Flores-Hernandez presented to Dr. Padilla with a six-month history of irregular menstrual bleeding in November 2007, the national standard of care required that she be evaluated for a specific cause of those symptoms.  Although Dr. Padilla performed a Pap smear at the time, Dr. Boothby testified that a Pap smear, without more, was insufficient because a Pap smear is a test used to screen for cancer in asymptomatic patients.  Flores-Hernandez was not asymptomatic, Dr. Boothby explained.  Rather, because she was presenting with symptoms that could have been indicative of cervical or endometrial cancer—potential causes that Dr. Padilla admittedly placed in his differential diagnosis at the time (along with other less serious alternatives, such as perimenopause and fibroids)—Dr. Boothby explained that she required more definitive diagnostic testing to rule in or rule out cancer as the cause of her symptoms.  In turn, Dr. Boothby opined that the national standard of care required Dr. Padilla to refer Flores-Hernandez to a gynecologist in November 2007 for further diagnostic testing, such as a colposcopy and other biopsies, as appropriate.

In forming his opinions, Dr. Boothby relied, in part, on a practice bulletin issued by the American College of Obstetricians and Gynecologists (ACOG) entitled "Management of anovulatory bleeding."  Generally speaking, ACOG's practice bulletins are international

publications designed to "aid practitioners in making decisions about appropriate obstetric and gynecologic care." The particular bulletin cited by Dr. Boothby pertains to the care and treatment of patients who present with "anovulatory bleeding," which the bulletin defines to include "menorrhagia," "metrorrhagia," and "menometrorrhagia." It sets forth a number of potential diagnoses for the symptoms, including "anovulation," "uterine leiomyoma [fibroids]," "endometrial polyp," "endometrial hyperplasia or carcinoma," "cervical or vaginal neoplasia," and more. During his testimony, Dr. Boothby specifically highlighted the bulletin's statement that "[t]he diagnosis of anovulatory bleeding is made after the exclusion of anatomic pathology." In his view, this means that when a patient presents with menometrorrhagia symptoms, as in this case, the doctor's first step should be to exclude "anatomic pathology" by performing further diagnostic testing—*i.e.*, cervical and/or endometrial biopsies—to confirm whether the symptoms are being caused by a potential cancer. The bulletin also advises that "[b]ased on age alone, endometrial assessment to exclude cancer is indicated in any woman older than 35 years who is suspected of having anovulatory uterine bleeding." Ultimately, relying on these standards, Dr. Boothby opined that Dr. Padilla violated the national standard of care in November 2007 by failing to refer Flores-Hernandez to a gynecologist for further diagnostic testing at that time.[2]

In response, the Government presented expert testimony from Dr. Jeffrey Lin, who is also board-certified in both gynecology and gynecological oncology. For his part, Dr. Lin largely

---

[2]     The Government argues that the Court should not afford the ACOG bulletin any weight because it does not expressly recommend a "colposcopy" for symptoms of anovulation, nor does it state that "cervical cancer" falls within the differential diagnosis for anovulation. While the Government may be correct that the ACOG bulletin does not use those precise terms, it does list "cervical or vaginal neoplasia" within the differential diagnosis for anovulation—terms that describe premalignant cell abnormalities that are precursors to cancer. The Government also overlooks Dr. Padilla's own testimony that, based upon Flores-Hernandez's menometrorrhagia symptoms, he placed cervical cancer within his differential diagnosis in November 2007. Therefore, the Government's argument on this point is not persuasive.

focused on the reasonableness of Dr. Padilla's treatment of Flores-Hernandez during the time period from December 2008 forward. He opined that Dr. Padilla fully complied with the national standard of care when he referred Flores-Hernandez to a gynecologist following the abnormal results from her December 2008 and May 2009 Pap smear examinations. But Dr. Lin's opinions were less helpful with respect to Dr. Padilla's care of Flores-Hernandez in November 2007. To be fair, Dr. Lin did testify that he believes Dr. Padilla's treatment at that time complied with the national standard of care—pointing out that Dr. Padilla took a "careful history" of her bleeding pattern, checked her blood count, ordered thyroid testing, performed a Pap smear, and more. But noticeably absent from his testimony was a clear statement one way or the other as to whether the standard of care required, as Dr. Boothby testified, that Flores-Hernandez be referred for additional testing with a gynecologist in November 2007 based on her irregular menstrual bleeding symptoms.

Ultimately, in response to direct questioning from the Court at the conclusion of his trial testimony, Dr. Lin testified as follows:

> THE COURT: There has been testimony that suggests that the national standard of care would require a patient who presents with heavy menstrual bleeding for a period of like six months should be referred for a biopsy. Do you agree with that?

> THE WITNESS: So let me just repeat your question and then you can tell me if that's right. So, you are saying that there was testimony that the national standard of care for a woman that has six months of heavy menstrual bleeding should be referred for a biopsy? Is that what you're saying?

> THE COURT: Yes.

> THE WITNESS: And that's not taking into account the Pap smear abnormality or?

> THE COURT: Yes. No, no Pap smear abnormality.

> THE WITNESS: It depends a little bit about the, to me, it depends a little bit about the history of the patient, what her risk factors for endometrial cancer might be. A little bit about what her age is. And also, as I mentioned I think previously, you know, sometimes what somebody thinks is heavy bleeding may, in fact,

might be heavy bleeding, but it might not be so heavy.  Patients' impressions of it
are quite variable.

In short, Dr. Lin did not expressly disagree with or controvert Dr. Boothby's opinion that the

national standard of care required Dr. Padilla to refer Flores-Hernandez to a gynecologist in

November 2007.  And when directly asked whether the standard of care required Dr. Padilla to

make such a referral, Dr. Lin's answer was, "it depends."  On balance, the Court does not find

this sort of equivocation sufficient to overcome Dr. Boothby's clear and unequivocal opinion on

this point, particularly given the corroboration of the ACOG practice bulletin.[3]

The Government also urges the Court to find Dr. Boothby's testimony "not credible,"

arguing that several of his opinions at trial contradicted his prior deposition testimony and/or the

record evidence in the case.  Specifically, the Government asserts that Dr. Boothby was

impeached as to the following points:

- Dr. Boothby's trial testimony that Flores-Hernandez likely had Stage I cancer
as of May 2009 contradicted his deposition testimony that she likely had dysplasia
(and not invasive cancer) in June 2009.

- Dr. Boothby's trial testimony that a cone biopsy in late 2007 or early 2008
would have been all the treatment Flores-Hernandez required contradicted his
deposition testimony that it was reasonable for Dr. Hamilton not to jump to a cone
biopsy in June 2009, but to bring Flores-Hernandez back for a Pap smear in six
months' time.

- Dr. Boothby's trial testimony that Dr. Padilla had "essentially run the clock
out in being able to cure" Flores-Hernandez contradicted his deposition testimony
that Flores-Hernandez likely only had dysplasia (and not invasive cancer) in June
2009, after Dr. Padilla had already referred her to a gynecologist.

In reality, some of these "impeachments" were more impactful than others.  But all of these

apparent contradictions relate to Dr. Boothby's opinions concerning causation, and not the

---

[3]     Moreover, even if the standard of care did only require gynecological referral for some
patients with irregular menstrual bleeding, but not others, as Dr. Lin's testimony arguably
suggests, the Court believes that Flores-Hernandez more likely than not would have fallen into
the category that should have been referred for further evaluation with a specialist, given her
inclusion in a higher-risk age group and the six-month duration of her symptoms.

applicable standard of care.[4]   Accordingly, while the Court believes that Dr. Boothby's inconsistent testimony impacts the credibility of his causation opinions, as explained below, the same is not true with respect to his standard of care opinions, particularly in the absence of any contradictory testimony from Dr. Lin or any of the Government's other witnesses during trial.

Ultimately, after weighing the testimony from the parties' respective expert witnesses, the Court finds that Flores-Hernandez successfully established, by a preponderance of the evidence, that: (1) when Flores-Hernandez presented to Dr. Padilla in November 2007 complaining of a six-month history of irregular and excessive menstrual bleeding, the national standard of care required Dr. Padilla to refer her to a gynecologist for further diagnostic testing; and (2) Dr. Padilla breached that standard of care by failing to refer Flores-Hernandez to a gynecologist for testing at that time.[5]

---

[4]     At the conclusion of trial, the Government moved to strike these particular opinions of Dr. Boothby.  The Court denied the Government's request and indicated that it would "take into account the testimony and the impeachment in judging Dr. Boothby's credibility."

[5]     Flores-Hernandez also argues that, even if the Court were to accept the Government's proposed standard of care—that Dr. Padilla was only required to refer Flores-Hernandez to a gynecologist after a Pap smear returned abnormal results (*i.e.*, ASCUS and high-risk HPV)—she established a breach under that standard as well.  More specifically, after her November 2007 Pap smear results came back as "unsatisfactory for evaluation" due to obscuring blood, Flores-Hernandez contends that Dr. Padilla violated the standard of care by failing to repeat the Pap smear until more than an entire year later, in December 2008.  Flores-Hernandez makes a strong point.  To the extent that her symptoms were concerning enough to Dr. Padilla to warrant a Pap smear in the first place, it seems to follow that he should have promptly repeated the procedure after the initial results were unusable.  And, surprisingly, the Government failed to come forward at trial with any legitimate explanation for Dr. Padilla's delay, other than to point out that Flores-Hernandez apparently missed a follow-up appointment in late November 2007.  While this may be true, the evidence also established that Flores-Hernandez came to the clinic just a couple of weeks later in early December 2007, and the Court finds it more likely than not that she met with Dr. Padilla during that visit.  Yet, Dr. Padilla did not perform another Pap smear on Flores-Hernandez until December 2008.  The Court recognizes that Flores-Hernandez testified that she received a Pap smear from Dr. Padilla on December 6, 2007, but insofar as she stated otherwise at other points in her testimony and given the absence of any other documents, test results, or other evidence to show that such she was tested on December 6th, the Court believes Flores-Hernandez was simply confused during questioning and mixed up the timeline of events.

**C. Whether Dr. Padilla's Violation of the Standard of Care Proximately Caused The Delay in the Diagnosis and Treatment of Flores-Hernandez's Cervical Cancer**

Flores-Hernandez's burden does not end there.  Not only must she establish that Dr. Padilla breached the applicable standard of care, but, perhaps more importantly, she must also establish that his breach was the cause of the injuries for which she seeks recovery.

Of course, "the fact of causation is incapable of mathematical proof, since no one can say with absolute certainty what would have occurred if the defendant had acted otherwise." *Psychiatric Inst. of Wash. v. Allen*, 509 A.2d 619, 624 (D.C. 1986) (quoting W. Prosser & W. Keeton, THE LAW OF TORTS § 41, at 269-70 (5th ed. 1984)).  At the same time, however, "[d]ue to the great variety of infections and complications which, despite all precautions and skill, sometimes follow accepted and standard medical treatment, an inference of negligence in a malpractice suit cannot be based solely on the fact that an adverse result follows treatment." *Giordano v. Sherwood*, 968 A.2d 494, 498 (D.C. 2009) (quoting *Quin v. George Washington Univ.*, 407 A.2d 580, 583 (D.C. 1979) (internal quotations omitted).  Instead, a plaintiff must proffer expert testimony "based on a reasonable degree of medical certainty, that the defendant's negligence is more likely than anything else to have been the cause (or a cause) of the plaintiff's injuries." *Id.*; *Townsend v. Donaldson*, 933 A.2d 282, 298 (D.C. 2007).

Flores-Hernandez argues that, if Dr. Padilla had referred her to a gynecologist in or around November 2007, as the standard of care required, her cervical cancer would have been diagnosed long before July 2010, and long before the disease had already progressed to Stage IVA.  Instead, Flores-Hernandez contends that she would have been diagnosed by no later than late 2008 or early 2009 with pre-malignant dysplasia or early Stage I cervical cancer—conditions

---

Nevertheless, inasmuch as the Court accepts Dr. Boothby's definition of the applicable standard of care and concludes that Dr. Padilla breached that standard, the Court need not and does not decide whether Flores-Hernandez would prevail under this alternative theory.

that would have been fully treated with a cone biopsy procedure, without the need for radiation treatment or chemotherapy. She also asserts that her five-year survival rate would have been as high as 70-80% or better, rather than the 15-16% survival rate she faced as a result of her Stage IVA cancer diagnosis in July 2010. To reach this result, Flores-Hernandez essentially asks the Court to pick up the timeline of her treatment from June 2009 through July 2010, move that timeline up one-and-a-half years earlier, and assume that the same sequence of events would have happened in almost exactly the same way. Stated differently, because she ultimately underwent a cone biopsy in June 2010—one year after she began treating with Dr. Hamilton in June 2009—Flores-Hernandez contends that the Court can reasonably assume that, if she had been referred to Dr. Hamilton (or another gynecologist) in November or December 2007, the same course of treatment would have led to a cone biopsy being performed approximately one year later, by late 2008 or early 2009.[6]

The Government attacks this theory as unsubstantiated and speculative. First, the Government contends that none of the medical experts could credibly claim that Flores-Hernandez had cervical cancer at the time she was referred to Dr. Hamilton in June 2009. Instead, the Government points out, when Dr. Hamilton performed a colposcopy in June 2009, the results of that procedure revealed a finding of CIN-1 or mild dysplasia—a non-cancerous, premalignant condition. As a result, the Government argues that because Flores-Hernandez failed to present evidence establishing that she already had cancer when she began treating with

---

[6]     Notably, Flores-Hernandez concedes that, after she was referred to a gynecologist, it was reasonable for her doctors to take an entire year to diagnose her cancer. As a result, she does not assert that any of Dr. Hamilton's treatment from June 2009 through March 2010 violated the standard of care. Nor does she take issue with the care she received from the doctors at Howard University Hospital beginning in March 2010. This was not always the case with respect to Dr. Hamilton. Flores-Hernandez originally asserted a negligence claim against Dr. Hamilton as well, but she abandoned that claim prior to trial when she dismissed Dr. Hamilton from this lawsuit with prejudice. (*See* Dkt. No. 53).

a gynecologist, she cannot carry her burden of proof that any of Dr. Padilla's actions delayed the diagnosis of her cervical cancer.  In addition, the Government challenges Flores-Hernandez's assertion that an earlier referral from Dr. Padilla would have resulted in a cone biopsy any sooner than it was actually performed, given that both Dr. Hamilton and the Howard University specialists elected to postpone a cone biopsy on several occasions.  The implication, it seems, is that if Flores-Hernandez's doctors delayed a cone biopsy when faced with a presumably more developed stage of her condition in 2009 and 2010—after several tests revealed CIN-1 and at least one indicated CIN-2—it is not reasonably likely that they would have pressed forward with the cone biopsy any earlier when faced with a less-developed stage of Flores-Hernandez's condition.  As a result, the Government maintains that Flores-Hernandez failed to sustain her burden as to causation.

In attacking Flores-Hernandez's cauation theory, the Government seems to suggest that Flores-Hernandez must prove that she already had invasive cancer by May 2009.  While this issue would be relevant as to damages, the Government's argument misses the critical inquiry as to causation.  The question is not solely whether Flores-Hernandez already had cancer when she was referred to a gynecologist.  The question is whether, if Flores-Hernandez had been referred to a gynecologist sooner, the course of treatment she received would have led to the treatment and eradication of her condition sooner, before it advanced to Stage IVA.  As noted above, however, Flores-Hernandez bears the burden to prove this theory to a "reasonable degree of medical certainty," *Giordano*, 968 A.2d at 498, and, on balance, the Court concludes that her proof of causation in this case is simply too speculative to carry the day.

To begin with, Flores-Hernandez relied almost exclusively on the testimony of Dr. Boothby to establish causation.  He testified at trial that, if Flores-Hernandez had been referred

to a gynecologist in November or December 2007, the "appropriate biopsies" likely would have found a small invasive cancer or a precancerous lesion.  He also opined that if Flores-Hernandez "had the cone biopsy that proves she had a pre-invasive lesion," that would have been the only treatment she needed.  He also offered an opinion about her condition in December 2008, testifying that her condition was basically unchanged from one year prior—in his opinion, she likely had an early cancer or precancerous dysplasia at that time, which would have been treated with a cone biopsy.  By May 2009, however, Dr. Boothby opined that Flores-Hernandez's condition had likely progressed to a Stage I or Stage II invasive cancer, meaning that radiation and/or chemotherapy were likely necessary by that point.  Based on these opinions, Flores-Hernandez argues that Dr. Padilla's failure to refer her to a gynecologist in November 2007 delayed the diagnosis and ultimate treatment of her cancer, when an earlier referral would have ultimately led to a cone biopsy that could have completely eradicated her cancer.

As the Government rightly points out, Dr. Boothby's opinions at trial were patently inconsistent with his prior deposition testimony.  During his deposition, Dr. Boothby testified that he believed Flores-Hernandez's condition had not progressed to invasive cancer as of June 2009, but was more than likely dysplasia—a pre-malignant condition.   Specifically, the Government impeached Dr. Boothby with the following passage from his deposition:

> Q:  Do you believe to a reasonable medical probability that the patient [Flores-Hernandez], nonetheless, did have cervical cancer in June of 2009?
>
> A:  That's a very difficult question to answer.  In the face of the Pap smear and the – and the biopsy results, it would be difficult for me to stand here and tell you she had invasive cancer at that time.  So I think more than likely she had dysplasia at that time.

Thus, Dr. Boothby's testimony at trial flies directly in the face of his prior opinions on these issues.  Not only did he testify at trial that it was likely that Flores-Hernandez had Stage I or Stage II cancer as of May 2009—which directly contradicted the above admission—but he also

opined that she may have had a small Stage I cancer as early as November or December 2007—more than 18 months earlier.  Given his contradictory testimony on these issues, the Court does not find Dr. Boothby's opinions concerning the progression of Flores-Hernandez's condition or the likelihood of particular treatments at particular times to be credible.[7]

In addition, Dr. Boothby's opinions are undermined by the medical evidence presented at trial.  First, his testimony that Flores-Hernandez may have already had a small invasive cancer in November or December 2007 is inconsistent with the results of her June 2009 colposcopy and biopsy.  As the Government points out, the results of those tests indicated a finding of CIN-1—the lowest grade dysplasia that a patient could have.  If the same tests had been performed approximately eighteen (18) months earlier, the Court finds it rather unlikely that they would have indicated that Flores-Hernandez's condition was <u>more</u> advanced, such as in the form of "a small invasive cancer," as Dr. Boothby posited.  The Court finds it more likely that, at worst, the tests would have indicated the same results—a finding of CIN-1—but it is equally likely that the results in November or December 2007 would not have revealed any atypical cells at all, given that Flores-Hernandez's preceding Pap smear approximately one year prior in August 2006 was returned "negative for intraepithelial lesion and malignancy."[8]

---

[7]    The Court recognizes that Dr. Boothby attempted to rehabilitate himself by explaining that his changed opinion was based upon information in Flores-Hernandez's medical records that he had previously overlooked—specifically, Dr. Padilla's description of the white plaque he observed on her cervix during an examination in May 2009.  But this justification is not particularly compelling, given that Dr. Boothby admitted that he had received these same records before his deposition in the case and therefore could have drawn the same conclusion earlier. Moreover, the Court finds it significant that Dr. Boothby failed to provide any supplemental expert report in advance of trial, indicating that any of his opinions had changed.

[8]    The same holds true with respect to Dr. Boothby's opinions concerning the extent of her condition in December 2008, and later in May 2009.  Inasmuch as the colposcopy that was performed in June 2009 only indicated a finding of CIN-1, testing performed before that time likely would not have indicated any degree of dysplasia beyond CIN-1, if anything.

Second, even assuming without deciding that the results of a Pap smear or colposcopy in late 2007 would have shown CIN-1, Flores-Hernandez's argument that such a result would have led to a cone biopsy within one year is not supported by the record.  Flores-Hernandez did not present any testimony, from Dr. Boothby or otherwise, establishing that a cone biopsy would have been the appropriate course of treatment upon a finding of CIN-1.  Instead, the evidence showed precisely the opposite—that the appropriate treatment for CIN-1 is observation and monitoring of the patient, with additional follow-up testing in approximately six months.  The Government presented an ACOG bulletin to this effect, and even Dr. Boothby expressly agreed with those recommendations.  In fact, this was the very course of action that Dr. Hamilton initially adopted in mid-2009, when the results of Flores-Hernandez's biopsy returned a finding of CIN-1.  She expressly deferred moving to a LEEP procedure or a cone biopsy and planned to bring Flores-Hernandez back for another Pap smear in six months.  While Dr. Boothby disagreed with this approach at trial, the Government impeached him with his deposition testimony on this issue as well:

> Q:  Would you agree that it was reasonable for Dr. Hamilton not to jump to a cone biopsy in June of 2009, but to just bring the patient [Flores-Hernandez] back for a Pap smear 6 months later?
>
> A:  Yes, that's not unreasonable at all.

In view of Dr. Boothby's patent contradiction, the Court finds his prior deposition testimony to be more credible than his trial testimony on this point.[9]

---

[9]   Just as before, Dr. Boothby attempted to deflect the impact of this impeachment by claiming that Dr. Hamilton's initial colposcopy was insufficient because she did not also perform an endocervical curetting.  But the evidence on this point actually shows otherwise—that Dr. Hamilton did perform an ECC in June 2009.  In addition, although Dr. Boothby again claimed that he only recently discovered this apparent omission from reviewing the records again, he admitted that he had the same records prior to his deposition in the case.  Thus, Dr. Boothby's explanation is unavailing.

Relatedly, Flores-Hernandez asks the Court assume that, if a proper endometrial biopsy had been performed during 2008, the results would have revealed sufficiently advanced dysplasia to trigger a subsequent cone biopsy procedure.   But Flores-Hernandez fails to proffer sufficiently credible evidence on this point, and the Court cannot and will not make this leap of logic on her behalf.   First, to the extent Flores-Hernandez relies on Dr. Boothby's opinions to support this argument, the Court does not find his testimony on these issues to be credible for the reasons already stated.   Second, the record suggests that the reason that Dr. Hamilton and Ms. Yoxthimer attempted to perform an endometrial biopsy in the first place was because of Flores-Hernandez's complaints of menstrual bleeding a couple of months into treatment—and not because of the abnormal Pap smear results or the CIN-1 finding from the colposcopy.   Therefore, to assume that an endometrial biopsy would have taken place in 2008, the Court would need to find that it is more likely than not that Flores-Hernandez would have complained to Dr. Hamilton about menstrual bleeding at some point during that timeframe, and the evidence does not tilt in Flores-Hernandez's favor on this point.   To begin with, the record shows that Flores-Hernandez did not complain about any irregular menstrual bleeding during her initial visit with Dr. Hamilton in June 2009, despite being asked about any unusual symptoms or concerns.    In addition, although Flores-Hernandez testified at trial that she "always" complained about her bleeding symptoms, which "increased day by day," the Court does not find her testimony to be credible on this point.   When Flores-Hernandez saw Dr. Padilla in December 2008 and May 2009, there is no indication in her medical charts that she raised any concerns about irregular bleeding during those visits.[10]   In addition, at no point between December 2007 and December

_____

[10]     Flores-Hernandez asks the Court to attribute the absence of any such complaints in her medical records to Dr. Padilla's "sloppy" record-keeping.   Even if the Court credited that argument to some extent, the implication is seriously undermined by the fact that Dr. Hamilton's

2008 did Flores-Hernandez visit the Upper Cardozo Clinic for any medical issues, let alone to raise specific concerns about any irregular menstrual bleeding. The Court finds this fact to be significant, particularly given that Flores-Hernandez's past practice shows she was not shy about making trips to the clinic when she had medical concerns. But, ultimately, even if the Court were to find that Dr. Hamilton would have performed an endometrial biopsy on Flores-Hernandez at some point during 2008—a question that could have been easily posed to Dr. Hamilton during trial, but was not—Flores-Hernandez failed to establish that the results of such a biopsy would have led to a cone biopsy any sooner.[11] In short, this theory requires the Court to stack assumption upon assumption, which the Court cannot do.[12]

---

medical chart from Flores-Hernandez's June 2009 visit—her first and initial consultation with a gynecologist who specializes in these types of issues—also contains no indication that Flores-Hernandez raised concerns about unusual bleeding.

[11]    Flores-Hernandez did not present any expert testimony, other than arguably from Dr. Boothby, as to what the likely results of an endometrial biopsy would have revealed in 2008, let alone what the appropriate course of treatment would have been based on those results. If anything, the evidence establishes that an endometrial biopsy taken in 2008 might have revealed the presence of CIN-1 or CIN-2, given that Ms. Yoxthimer's subsequent attempt at an endometrial biopsy yielded CIN-1 and CIN-2 endocervical cells in late 2009. Given the nature of an endometrial biopsy—which Dr. Hamilton explained was a "blind" procedure—there is no basis for the Court to find it more likely than not that a biopsy would have obtained anything beyond CIN-1 or CIN-2 tissue in any event. But even if an endometrial biopsy had been performed in 2008, and even if it had shown CIN-1 or CIN-2, Flores-Hernandez did not present any evidence that the appropriate standard of care upon a finding of CIN-2 would have led to a cone biopsy or some other excisional procedure.

[12]    Dr. Boothby also proffered an alternative causation theory—that Dr. Padilla's failure to promptly refer Flores-Hernandez to a gynecologist made her cancer harder to diagnose. While this argument seems somewhat counterintuitive at first, Dr. Boothby opined that the additional passage of time allowed the cancer to grow, which, in turn, caused Flores-Hernandez's cervix to become stenotic and prevented Dr. Hamilton and Ms. Yoxthimer from performing a successful endometrial biopsy in 2009 and early 2010. During trial, Dr. Boothby testified that there was no other reason he could find in Flores-Hernandez's medical records that would have caused this type of stenosis. On cross-examination, however, the Government directed Dr. Boothby to evidence in the medical records indicating that Flores-Hernandez had previously undergone a dilation and curettage for a prior abortion procedure, and Dr. Boothby admitted that this procedure could also have been a cause of the stenosis. In view of this, the Court affords no weight to Dr. Boothby's opinion that the growth of Flores-Hernandez's cancer caused her

Two additional points merit discussion.  First, along with Dr. Boothby, Flores-Hernandez presented the expert testimony of Dr. William Weisburger, a board-certified pathologist.  Among other issues, Dr. Weisburger provided testimony explaining what the results of Flores-Hernandez's pathology reports (*i.e.*, her Pap smear and biopsy results) showed as time progressed.  But Flores-Hernandez focuses more on Dr. Weisburger's testimony concerning what those results did <u>not</u> show.  He testified that, even when a Pap smear or a biopsy indicates a finding of CIN-1, that finding does not exclude the possibility that more advanced dysplasia, or even invasive cancer, could exist elsewhere in the cervix.  As he put it, the CIN-1 finding could simply be the "tip of the iceberg."  Based on this testimony, Flores-Hernandez asks the Court to discount the import of the diagnostic test results on which the Government relies, arguing that even if the biopsy results showed CIN-1, it is possible that Flores-Hernandez could have already had cancer elsewhere in her cervix that those tests simply did not discover.  The problem with this argument is that, absent any concrete testimony or evidence, the opposite inference could equally be true.  And even Dr. Weisburger admitted that he could not state to any degree of medical certainty whether Flores-Hernandez had cancer at the time of any of those procedures, nor did he offer any other opinions as to when her cancer began, where it originated, or whether biopsies conducted in 2008 would have discovered any such cancer.  Accordingly, the Court concludes that Dr. Weisburger's tip-of-the-iceberg theory is simply too speculative to support Flores-Hernandez's theory of causation.  *See Giordano*, 968 A.2d at 498 (quoting *Sponaugle v. Pre-Term, Inc.*, 411 A.2d 366, 367 (D.C. 1980)) ("While absolute certainty is not required, opinion evidence that is conjectural or speculative is not permitted.").

---

stenosis or otherwise precluded Dr. Hamilton from performing an adequate endometrial biopsy in 2009 and 2010.

Second, Flores-Hernandez places great emphasis on the parties' stipulation that "cervical cancers are typically slow-growing cancers." Given the typical development of cervical cancer, she argues that it is more likely than not that some degree of cancer must have been present at some point during 2008 or early 2009. The Court does not find this argument particularly compelling on the issue of causation. To begin with, Flores-Hernandez appears to overstate the nature of the parties' stipulation by arguing that the Government stipulated that Flores-Hernandez had a slow-growing cancer; the Government stipulated that cervical cancer is typically slow-growing, not that Flores-Hernandez's specific case of cervical cancer was slow-growing. Even more importantly, Flores-Hernandez's argument on this point conflates the salient issue underlying her causation theory. To meet her burden of proof, she cannot prove causation simply by proving the presence of cancer. Even if her cancer were present in 2008, the real issue is whether she can prove that it would have been detected by a gynecologist—and therefore treated—in 2008 or 2009. As already explained, however, Flores-Hernandez did not present credible evidence to prove that the course of her treatment would have been accelerated by an earlier referral to a gynecologist, let alone that she would have undergone an earlier cone biopsy, as she suggests.[13] Therefore, this stipulation merits minimal significance, and it certainly does not suffice to carry Flores-Hernandez's burden to establish causation.

---

[13] In this regard, not only did Dr. Hamilton initially defer a cone biopsy despite finding CIN-1 and CIN-2 cells in mid- to late-2009, but Howard University specialists—having reviewed Flores-Hernandez's entire history and range of test results—also postponed a cone biopsy procedure following Flores-Hernandez's initial consultation at Howard in March 2010. Rather, they planned to perform another colposcopy in six months and to reevaluate Flores-Hernandez at that time. There was no credible evidence presented to prove that the Howard specialists would have taken any different course of action in 2008, particularly considering that the test results from earlier procedures likely would have indicated an equally developed, if not less developed, stage of Flores-Hernandez's condition.

The Court also observes that, based on the testimony presented at trial, it appears that Flores-Hernandez's cone biopsy was only rescheduled because Dr. Padilla intervened and

Overall, Flores-Hernandez simply failed to adduce sufficient evidence to prove that it is more likely than not that her cancer (or precancerous condition) would have been diagnosed and treated any earlier—whether through a cone biopsy or otherwise—if Dr. Padilla had referred her to a gynecologist in November or December 2007.

**D. Damages**

Because Flores-Hernandez did not establish by a preponderance of the evidence that Dr. Padilla's breach of the standard of care delayed the ultimate diagnosis and treatment of her cervical cancer, she is not entitled to recover damages, whether in the form of past medical expenses, compensation for pain and suffering, any potential decrease in her life expectancy, or any other damages associated with the possible recurrence of her cancer in the future.

## <u>CONCLUSION</u>

In reaching this difficult decision, the Court emphasizes that it takes nothing away from the physical and emotional pain that Flores-Hernandez has endured, and will likely continue to endure, in battling against her horrible disease.  But even with all the scientific advances of our time, medicine remains an imperfect science, and diagnostic tests are fallible and far from comprehensive.  At the end of the day, while Flores-Hernandez established that Dr. Padilla violated the standard of care by failing to refer her to a gynecologist in November or December 2007, she simply failed to establish, by a preponderance of the evidence, that his failure to do so proximately caused a delay in the ultimate diagnosis and treatment of her cervical cancer.  As a

---

contacted her doctors at Howard in April or May of 2010.  Thus, while the Court finds that Dr. Padilla violated the standard of care by failing to refer Flores-Hernandez to a gynecologist in November or December 2007, he ironically turned out to be the catalyst for the June 2010 cone biopsy that ultimately diagnosed her cancer.

result, the Court finds that Flores-Hernandez failed to prove that the United States is liable for her claim of medical malpractice, and the Court therefore finds in favor of the Government.

A judgment consistent with these findings shall issue this date.

SO ORDERED.

Date:  December 18, 2012

_____
ROBERT L. WILKINS
United States District Judge