**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| |
|---|
| **ROSA ALBA FLORES-HERNANDEZ**, |
| Plaintiff, |
| v. |
| **UNITED STATES OF AMERICA, *et al.*,** |
| Defendants. |

Civil Action No. 11-cv-897 (RLW)

**MEMORANDUM OPINION**

In November 2012, the Court presided over a four-day bench trial in this case, ultimately finding that Plaintiff Rosa Alba Flores-Hernandez ("Flores-Hernandez") failed to carry her burden of proof on her delayed-diagnosis medical malpractice claim. In brief, Flores-Hernandez asserted that Defendant United States of America (the "United States" or the "Government"), acting through Dr. Luis Padilla, negligently delayed in referring her to a specialist for diagnostic tests that, according to Flores-Hernandez, would have detected the presence of her cervical cancer much earlier than it was ultimately discovered. Because of Dr. Padilla's delay, Flores-Hernandez argued, by the time her cancer was ultimately discovered and diagnosed, the disease had already progressed to Stage IVA cervical cancer and her chances of recovery and survival were only a fraction of what they might have been.

After careful consideration of all of the evidence presented at trial, the Court found that Flores-Hernandez did successfully establish some elements of her malpractice claim—the applicable standard of care, and also a deviation from that standard on Dr. Padilla's part when he failed to timely refer Flores-Hernandez to a gynecologist based on the symptoms she presented with at the time. But the Court's analysis—and Flores-Hernandez's burden—did not end there.

1

Although she proved that Dr. Padilla breached the applicable standard of care by a preponderance of the evidence, the Court found that she did not clear the final hurdle to prove her claim because she failed to demonstrate that Dr. Padilla's actions proximately caused a delay in the ultimate diagnosis and treatment of her cervical cancer.  Simply put, Flores-Hernandez's evidence on this last element was simply too speculative to carry the day, and the only expert testimony she presented with respect to causation was not credible.  Consequently, the Court found against Flores-Hernandez and issued judgment in favor of the United States.[1]

Flores-Hernandez now moves to alter and amend this judgment under Federal Rule of Civil Procedure 59(e), arguing that the Court's Findings of Fact and Conclusions of Law contain "several factual errors on the face of the record that result in its finding that Dr. Padilla's negligence did not matter to Flores-Hernandez's outcome."  (Dkt. No. 72 ("Pl.'s Mem.") at 1). She argues that "[t]he Court did not just reach the wrong conclusion in failing to make [these] findings—it misconstrued, or in some cases, overlooked facts about this case which showed the likely course of events if Dr. Padilla had followed the standard of care."  (*Id.*).  She maintains that the "clear errors" committed by the Court warrant amendment of judgment in her favor, and an award of damages, as she sought at trial.  The Court does not agree.

Accordingly, upon careful consideration of the parties respective briefing, (Dkt. Nos. 72, 77, 80), and the entire record in this action, the Court concludes that Flores-Hernandez's Motion to Alter and Amend Judgment will be **DENIED** for the reasons set forth herein.

---

[1]     For purposes of this Opinion, the Court provides only a general summary of the most salient facts and findings surrounding Flores-Hernandez's claim and the presentation of this case at trial.  A more detailed discussion can be found in the Court's Findings of Fact and Conclusions of Law.  *See Flores-Hernandez v. United States*, --- F. Supp. 2d ----, 2012 WL 6600366 (D.D.C. Dec. 18, 2013).

## ANALYSIS

### A.  Standard of Review

Motions to alter or amend under Rule 59(e) are disfavored, "and relief from judgment is granted only when the moving party establishes extraordinary circumstances." *Niedermeier v. Office of Max S. Baucus*, 153 F. Supp. 2d 23, 28 (D.D.C. 2001) (citing *Anyanwutaku v. Moore*, 151 F.3d 1053, 1057 (D.C. Cir. 1998)).  As explained by our Circuit, a Rule 59(e) motion "need not be granted unless the district court finds that there is an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice." *Messina v. Krakower*, 439 F.3d 755, 758 (D.C. Cir. 2006); *Firestone v. Firestone*, 76 F.3d 1205, 1208 (D.C. Cir. 1996).  Consequently, "a losing party may not use a Rule 59 motion to raise new issues that could have been raised previously." *Kattan by Thomas v. District of Columbia*, 995 F.2d 274, 276 (D.C. Cir. 1993).  Nor is a Rule 59 motion a means by which to "reargue facts and theories upon which a court has already ruled," *New York v. United States*, 880 F. Supp. 37, 38 (D.D.C. 1995), or "a chance . . . to correct poor strategic choices," *SEC v. Bilzerian*, 729 F. Supp. 2d 9, 15 (D.D.C. 2010).

### B.  Flores-Hernandez Does Not Merit Relief Under Rule 59(e)

Through her Rule 59(e) motion, Flores-Hernandez raises three purported errors on the Court's part that she contends warrant reversal of its prior ruling.   First, she argues that the Court erred "in determining that Dr. Hamilton would not have performed an endometrial biopsy in late 2007 or early 2008," assuming that Dr. Padilla had promptly referred her to a gynecologist at that time.  (*Id.* at 3-6).  Second, she asserts that "the Court erred in finding that Ms. Flores-Hernandez did not prove that she would have had some stage of diagnosable cancer at the time Dr. Padilla violated the standard of care."  (*Id.* at 6-15).  And third, she argues that the Court "erred in determining that a cone biopsy would not have been performed sooner if Dr. Padilla

3

complied with the standard of care in late 2007." (*Id.* at 15-20).  The Court considers each of these contentions in turn, but concludes that none warrants relief.

**1.  The Court's Finding That Flores-Hernandez Did Not Prove That An Endometrial Biopsy Would Have Been Performed In 2008**

Flores-Hernandez first insists that the Court erred in finding that she failed to prove, by a preponderance of the evidence, that an endometrial biopsy would have been performed during 2008, if she had been more promptly referred to a gynecologist by Dr. Padilla.  On this point, the Court agrees with her initial premise—that, based on the evidence, it appears that Dr. Hamilton and her assistant were prompted to perform an endometrial biopsy, at least in part, based on Flores-Hernandez's complaints of irregular menstrual bleeding in late July 2009.  Yet Flores-Hernandez seems to ignore the next step in the Court's analysis—that "to assume that an endometrial biopsy would have taken place in 2008, the Court would need to find that it is more likely than not that Flores-Hernandez would have complained to Dr. Hamilton about menstrual bleeding at some point during that timeframe, and the evidence does not tilt in Flores-Hernandez's favor on this point." *Flores-Hernandez*, 2012 WL 6600336, at *14.  In support of this conclusion, the Court set forth a number of evidentiary findings that cut against Flores-Hernandez, including that: (1) during her first visit with Dr. Hamilton, Flores-Hernandez did not describe any history or ongoing symptoms of irregular menstrual bleeding; (2) during her visits with Dr. Padilla in December 2008 and May 2009, there is no indication that Flores-Hernandez complained about any irregular menstrual bleeding; and (3) between December 2007 and December 2008, Flores-Hernandez did not return to Unity for any health concerns, and certainly not to complain about irregular bleeding.  *See id.*  On the other side of the coin, the Court also took note of Flores-Hernandez's testimony to the contrary—that she "always" complained to her doctors about menstrual bleeding during every visit, and that her symptoms "increased day by

day"—but, as the Court already explained, it did not find her testimony on this point to be credible. *Id.* Flores-Hernandez effectively ignores these findings.

Instead, she argues that the evidence shows that Dr. Hamilton ("or any other gynecologist that she might have been referred to") would have performed an endometrial biopsy immediately upon referral from Dr. Padilla in late 2007 or 2008. (Pl.'s Mem. at 4). But the record establishes no such thing. As the Government points out, this line of argument wrests a portion of Dr. Hamilton's testimony out of context, claiming that she said "Menometrorrhagia in a, at this time, 39-year-old would have required an endometrial biopsy in addition to the colposcopy." (*Id.* at 4). Notably, however, Dr. Hamilton's reference to "at this time" meant in June or July 2009, as reflected by her deposition testimony read into the record by Flores-Hernandez's counsel:

> Q:      "If [the history of metrorrhagia] had been reviewed by you prior to seeing her, how would that have impacted your treatment of her *at this point* [in June 2009] during the colposcopy?"
>
> Answer: "I still would have asked her the same questions. From the standpoint of irregular periods, same questions every time for a colposcopy: Is this resolved? What's going on with regards to this? I mean, that – the same questions."
>
> Then I said: "Okay, if it hasn't resolved, if this were still the case, then the same question: How would that have affected your opinion of her case?"
>
> "With regards to having – it depends on the quality, how heavy the periods are. Metrorrhagia in a, *at this time*, 39-year-old would have required an endometrial biopsy in addition to the colposcopy."
>
> "Okay. That's the step you would have taken if you had the history *at that time*?"
>
> "Correct. If she had reported that *at that time*, that would have been something that we would have discussed, correct."
>
> Is that your testimony?
>
> A:      Yes, it is.

(Dkt. No. 63, 11/15/12 AM Transcript, at 57-58) (emphases added). As shown, Dr. Hamilton repeatedly clarified that she was discussing potential treatment in mid-2009, and not in late-2007 or early-2008, as Flores-Hernandez seems to suggest. In addition, Dr. Hamilton's responses were not nearly as unequivocal as Flores-Hernandez would have the Court believe. As reflected

above, she concluded her testimony by stating that an endometrial biopsy "would have been something that [she] would have discussed" if presented with irregular bleeding, not that she definitely would have performed such a procedure.   And she stated the same on redirect, explaining that an endometrial biopsy would have been a *possibility*:

> Q:     Plaintiff's counsel asked whether, if the patient had told you that she had metrorrhagia at the June 8th visit, would that have changed your diagnosis.  And what is your answer to that?
>
> A:     He asked whether the report of the irregular bleeding would have changed what I would have done from the standpoint of the colposcopy and endometrial biopsy.  There would have been further questioning with the irregular bleeding, *and possibly a need for an endometrial biopsy* . . . .

(*Id.* at 79) (emphasis added).  Simply stated, Flores-Hernandez's counsel did not establish it was more likely than not that Dr. Hamilton would have performed an endometrial biopsy in 2008— much less that she "definitively" would have done so, (*see* Pl.'s Mem. at 6)— based solely on a referral from Dr. Padilla.  As the Court previously noted, this is "a question that could have been easily posed to Dr. Hamilton during trial, but was not."  *Flores-Hernandez*, 2012 WL 6600336, at \*14.  And the Court disagrees that Flores-Hernandez's tortured reading of Dr. Hamilton's testimony establishes that the Court committed an error with respect to this aspect of its analysis, much less the requisite "clear error" that would warrant relief here.

All that said, in making this particular argument, Flores-Hernandez seems to be missing the bigger picture.  Because even if she had proven that an endometrial biopsy would have been performed in late 2007 or early 2008, she still "failed to establish that the results of such a biopsy would have led to a cone biopsy any sooner" or otherwise accelerated her course of treatment. *Id.*  More specifically, the Court previously explained its reasoning as follows:

> Flores-Hernandez did not present any expert testimony, other than arguably from Dr. Boothby, as to what the likely results of an endometrial biopsy would have revealed in 2008, let alone what the appropriate course of treatment would have been based on those results.  If anything, the evidence establishes that an

endometrial biopsy taken in 2008 might have revealed the presence of CIN-1 or CIN-2, given that Ms. Yoxthimer's subsequent attempt at an endometrial biopsy yielded CIN-1 and CIN-2 endocervical cells in late 2009.  Given the nature of an endometrial biopsy—which Dr. Hamilton explained was a "blind" procedure—there is no basis for the Court to find it more likely than not that a biopsy would have obtained anything beyond CIN-1 or CIN-2 tissue in any event.  But even if an endometrial biopsy had been performed in 2008, and even if it had shown CIN-1 or CIN-2, Flores-Hernandez did not present any evidence that the appropriate standard of care upon a finding of CIN-2 would have led to a cone biopsy or some other excisional procedure.

*Id.* at *14 n.11.    Thus, Flores-Hernandez's supposition that she would have received an endometrial biopsy is only one step in the causation theory she pressed at trial.  Even if she could establish that the Court committed "clear error" in finding an endometrial biopsy unlikely in 2008, Flores-Hernandez would still need to show that the Court committed another "clear error" in concluding that she failed to show the results of such an earlier endometrial biopsy would have accelerated her treatment and led to an earlier diagnosis of her disease.  Because she comes up short on both of these issues, the Court rejects her plea for relief on these grounds.

### C. The Court's Purported Findings Regarding The Development Of Flores-Hernandez's Cancer

Flores-Hernandez's next argument is that the Court clearly erred in finding that she "had at worst CIN-1, or just as likely no abnormal cells at all, only two-and-one-half years before she was diagnosed with Stage IV cervical cancer."  (Pl.'s Mem. at 6).  While she devotes the bulk of her briefing to this particular argument, the Court need not dwell long here for the simple reason that the Court rendered no such finding.[2]

---

[2]    In pressing this argument, the Court presumes that Flores-Hernandez refers to its finding that, if she had undergone a colposcopy and biopsy in late-2007—as she ultimately did in mid-2009—that it was "likely that, at worst, *the tests would have indicated the same results*—a finding of CIN-1—but it is equally likely that *the results in November or December 2007 would not have revealed any atypical cells at all*."  *Flores-Hernandez*, 2012 WL 6600336, at *13 (emphases added).  But, in making this finding, the Court expressed no opinion about the *accuracy* of those theoretical results, or whether they would have revealed the true state of

As the Court previously made clear, the critical question underlying the issue of causation is not whether Flores-Hernandez can prove that she actually had invasive cancer at some particular point in time; rather, "the question is whether, if Flores-Hernandez had been referred to a gynecologist sooner, the course of treatment she received would have led to the treatment and eradication of her condition sooner, before it advanced to Stage IVA." *Flores-Hernandez*, 2012 WL 6600336, at *12; *see also id.* at *15 ("To meet her burden of proof, she cannot prove causation simply by proving the presence of cancer. Even if her cancer were present in 2008, the real issue is whether she can prove that it would have been detected by a gynecologist—and therefore treated—in 2008 or 2009."). And in this respect, the Court concluded its prior analysis by explaining that "Flores-Hernandez simply failed to adduce sufficient evidence to prove that it is more likely than not that *her cancer (or precancerous condition)* would have been diagnosed and treated any earlier—whether through a cone biopsy or otherwise—if Dr. Padilla had referred her to a gynecologist in November or December 2007." *Id.* at *15 (emphasis added). The Court therefore did not make any findings about the stage of Flores-Hernandez's disease in late-2007 or early-2008. Indeed, under the facts of this case and the evidence presented at trial, it was not necessary to do so because, even assuming that her condition was more progressed than the test results indicated, Flores-Hernandez still needed to prove that specialists acting within the applicable standard of care would have reached an earlier diagnosis and accelerated her treatment. It was on this point that Plaintiff's proof simply came up short.

Consequently, Flores-Hernandez's various arguments about the typical growth rate of cervical cancer—and her contentions about the parties' stipulation to that effect—completely

---

Flores-Hernandez's condition. Instead, as explained, the Court's focus was rightly on whether, in responding to those results, reasonable medical specialists would have discovered and diagnosed Flores-Hernandez's cervical cancer any earlier.

miss the mark.[3]  So too does her reliance on Dr. Boothby's testimony that she "had either a pre-invasive cancer or precancerous dysplasia at the time that Dr. Padilla initially violated the standard of care," and that her "cervical cancer developed over the course of many years, due to the usual course of that disease."  (Pl.'s Mem. at 7, 10).  This evidence places undue focus on the growth and degree of Flores-Hernandez's cancer, rather than on the critical issue of whether, in response to an earlier referral from Dr. Padilla, gynecological specialists would have discovered and diagnosed her cancer or precancerous condition—regardless of its progress—any sooner.

Additionally, as to Dr. Boothby's testimony, the Court previously made clear that it found his opinions on the issue of causation not credible.  *Flores-Hernandez*, 2012 WL 6600336, at *13; *id.* at *13 nn.7-8.  Undeterred, Flores-Hernandez tries to parse out Dr. Boothby's testimony regarding cervical cancer's "usual progression" and/or "any other aspect of cervical cancer in general" from his opinions about the development of Flores-Hernandez's specific case of cervical cancer, arguing that the Court expressed no credibility opinion as to the former category of testimony.  (*See* Pl.'s Mem. at 7 n.2).  The Court disagrees, but to remove all doubt, the Court hereby confirms, in no uncertain terms, that it did not find Dr. Boothby's testimony regarding any aspect of Flores-Hernandez's causation theory to be credible, including with respect to the growth-rate of Flores-Hernandez's cervical cancer.

Flores-Hernandez also attempts to draw support from *Tarpeh-Doe v. United States*, in which the D.C. Circuit explained: "When, as is often the case in medical malpractice actions, a defendant's negligent act or omission makes it more difficult to determine what the medical

---

[3]     The Court also rejects Flores-Hernandez's suggestion that it "overlooked" the fact of the Government's stipulations.  (Pl.'s Mem. at 7).  To the contrary, the Court squarely took the parties' stipulation that "cervical cancers are typically slow-growing cancers" into account, but found that this stipulation merited "minimal significance" because, *inter alia*, it only spoke in generalities and said nothing about whether "Flores-Hernandez's specific case of cervical cancer was slow-growing."  *Flores-Hernandez*, 2012 WL 6600336, at *15.

outcome would have been but for that negligence, the plaintiff's burden of demonstrating a favorable outcome may be lightened."  28 F.3d 120, 124 n.3 (D.C. Cir. 1994).  The Court finds this argument unavailing.  First, to the extent Flores-Hernandez relies on this language to argue that her causation burden should have been lightened, this is improper at the Rule 59 stage, given that she failed to advance this theory before.  *Kattan by Thomas*, 995 F.2d at 276 ("[A] losing party may not use a Rule 59 motion to raise new issues that could have been raised previously.").  But even if the Court were to consider this belated theory now, she fares no better on the substance.  As the Government points out, the majority in *Tarpeh-Doe* actually reversed the district court's verdict in favor of the plaintiff, at least in part, on the basis that there was no competent evidence presented to show that any earlier action would have prevented or slowed the progression of the plaintiff's condition:

> Nor is there any evidence that, had [the doctor] been available on June 3 [the date on which the plaintiff alleged he should have been evaluated], he could then have diagnosed, or more importantly correctly diagnosed, [the plaintiff's] condition or that earlier diagnosis would have prompted him to pursue a different course of treatment or would have slowed [the plaintiff's] deterioration.

*Id.* at 125 (emphasis omitted).  This reasoning closely parallels the Court's determination in this case—that Flores-Hernandez failed to present sufficient evidence from which the Court could reasonably conclude that an earlier referral from Dr. Padilla would have led to an earlier diagnosis of her condition, or that it would have eradicated her cancer sooner.

Finally, Flores-Hernandez wrongly argues that the Court committed a legal error by holding her to too high a burden in requiring "'concrete' evidence regarding the stage of her cancer when Dr. Padilla violated the standard of care."  (Pl.'s Mem. at 12).  In referencing "concrete" evidence, however, the Court was not requiring Flores-Hernandez to prove her case with certainty, or any other threshold beyond the "preponderance of the evidence" standard that governs her claim; rather, the Court was simply emphasizing that the opinion testimony she did

put forward was simply too speculative to carry the day.  *See Flores-Hernandez*, 2012 WL 6600336, at *14.  The Court rejects any suggestion to the contrary, and this particular argument does not establish any clear error justifying relief under Rule 59.

### D. The Court's Finding That Flores-Hernandez Did Not Prove That She Likely Would Have Undergone An Earlier Cone Biopsy With An Earlier Referral By Dr. Padilla

Finally, Flores-Hernandez argues that the Court committed clear error in finding that "a cone biopsy would not have been performed sooner if Dr. Padilla complied with the standard of care in late 2007."  (Pl.'s Mem. at 15).  In her view, "[t]he record shows clearly that this test, along with a colposcopy and cervical biopsy, would have been performed by a gynecologist in response to Ms. Flores-Hernandez's irregular menstrual bleeding, much sooner than eventually happened."  (*Id.* at 16).  To say that Flores-Hernandez pressed this argument previously would be an understatement—this was essentially her entire theory of the case, both throughout trial and in her post-trial briefing.  Therefore, the Court has already considered and rejected her assertions, and nothing she puts forward at this point convinces the Court that its analysis was in error, much less the "clear error" that she must show.

In large part, Flores-Hernandez relies again on the testimony and opinions of Dr. Boothby.  As should be patently clear by this point, however, the Court placed no stock in his causation opinions and found his testimony not credible.[4]  And other than Dr. Boothby, Flores-Hernandez failed to offer any expert testimony in support of her causation theory—i.e., that reasonable medical professionals would have progressed to more invasive diagnostic tests, such

---

[4]    Flores-Hernandez expends considerable effort in her reply brief attempting to rehabilitate Dr. Boothby's credibility.  (Dkt. No. 80 at 12-14, 20-22).  The Court already considered her attempts to explain Dr. Boothby's inconsistent testimony, and she presents nothing new that causes the Court to reconsider its prior assessment.

as a LEEP procedure or a cone biopsy, any sooner than they did.[5]  To the contrary, the evidence presented at trial established that, in response to a finding of CIN-1—which the Court determined would have been the likely result of Pap smear or colposcopy procedure performed on Flores-Hernandez in late 2007—the appropriate course of treatment would have been to observe and monitor, with follow-up testing in six months.  *Flores-Hernandez*, 2012 WL 6600336, at *13.  Similarly, as the Court previously explained, Flores-Hernandez failed to present any credible evidence at trial establishing that the likely response following a finding of CIN-2 would have been to proceed "to a cone biopsy or some other excisional procedure."  *Id.* at *14 n.11.  In the face of this testimony and the evidence surrounding her actual course of treatment once she was referred to specialists, the Court concluded that she simply failed to demonstrate that an earlier referral would have accelerated the diagnosis of her condition.

In attacking this reasoning, Flores-Hernandez accuses the Court of engaging in speculation, rather than considering what "the standard of care would have required of a subsequent treating gynecologist."  (Pl.'s Mem. at 19).  This argument is unavailing.  To the contrary, it was precisely the Court's duty to eschew speculation that precluded it from adopting Flores-Hernandez's theory of causation at trial.  It was her burden to establish, through expert testimony, that "based on a reasonable degree of medical certainty, that the defendant's negligence is more likely than anything else to have been the cause (or a cause) of [her] injuries."

---

[5]     Flores-Hernandez's only other expert witness was Dr. Weisburger, but he testified as a pathologist and readily admitted that he was not a clinician capable of offering opinions on the appropriate course of treatment:

> Q:     And Doctor, you agree that the recommended course of action for ASCUS and CIN-1 is to observe and monitor, because, as you said, many of those cases resolve themselves?
>
> A:     You know, I'm not a treating physician so I'm not going to tell you how to monitor a patient in that regard.  I make a diagnosis but I don't—I'm not a clinician, so I really can't answer that question.

(Dkt. No. 62, 11/14/12 AM Transcript, at 27).

*Giordano v. Sherwood*, 968 A.2d 494, 498 (D.C. 2009). Yet, Flores-Hernandez failed to proffer a credible expert witness to establish this causal link. And while she now argues that the Court must consider and apply the appropriate standard of care for a treating gynecologist, the Court did not receive any expert evidence on this issue at trial—in large part because of Flores-Hernandez's own strident objections that any such testimony would be irrelevant. (*See* Dkt. No. 61, 11/15/12 AM Transcript, at 81-103). In the absence of such evidence, the Court was left to consider the likely course of treatment based upon the actual medical care that was ultimately provided to Flores-Hernandez by Dr. Hamilton and the other gynecologists at Howard University Hospital—doctors, the Court emphasizes, whose treatment decisions Flores-Hernandez agreed were entirely reasonable and appropriate.[6] To this end, as the Court noted in its Findings of Fact and Conclusions of Law, both Dr. Hamilton and the Howard University specialists deferred and postponed a cone biopsy procedure in the face of diagnostic test results that, more likely than not, showed a more progressed stage of Flores-Hernandez's condition than would have been revealed by tests in late-2007 or early-2008, and "[t]here was no credible evidence presented to prove that the Howard specialists," or any other gynecologist for that matter, "would have taken any different course of action in 2008." *Flores-Hernandez*, 2012 WL 6600336, at *15 n.13.[7] Thus, simply put, based on the evidence presented at trial, Flores-Hernandez failed to prove that

---

[6]     Flores-Hernandez takes issue with this approach, arguing that the Court was incorrect in "focusing on what specifically Dr. Hamilton or Howard University would have done if Dr. Padilla had followed the standard of care and testing had begun in late 2007." (Pl.'s Mem. at 19). But in the absence of any expert evidence regarding the appropriate standard of care for a treating gynecologist—which Flores-Hernandez, herself, successfully sought to keep out during trial—the Court was left with no choice but to look to the treatment decisions of Flores-Hernandez's actual doctors; the only other alternative was to simply reject Flores-Hernandez's causation theory out of hand, which the Court declined to do.

[7]     In fact, as the Court pointed out, even Dr. Boothby agreed (during his deposition testimony) that it was reasonable for Dr. Hamilton not to "jump to a cone biopsy in June of 2009, but to just bring the patient [Flores-Hernandez] back for a Pap smear 6 months later." *Flores-Hernandez*, 2012 WL 6600336, at *13-14.

Dr. Padilla's breach of the standard of care caused a delay in the diagnosis and treatment of her cervical cancer.

Accordingly, the Court disagrees that it committed clear error as to this aspect of its analysis, and Flores-Hernandez is not entitled to any relief as a result.

## <u>CONCLUSION</u>

For the foregoing reasons, Flores-Hernandez's Motion to Alter and Amend Judgment must be **DENIED**.  An appropriate Order accompanies this Memorandum Opinion.


Date:  May 10, 2013

                                                          _____

                                                          ROBERT L. WILKINS

                                                          United States District Judge